LANCASTER et al. v. CROSBY.   (No. 2883.)

(Court of Civil Appeals of Texas.  Texarkana.
June 10, 1924.  Rehearing Denied
June 19, 1924.)

**1. Appeal and error ⊗⇒760(1) — Failure to
comply with court rule as to briefs warrants
refusal to consider same.**

Failure to observe rule 31 of Court of Civil
Appeals, requiring brief to contain "a clear and
accurate statement of the record bearing upon
the respective propositions with a reference to
the pages of the record," warrants court in
refusing to consider same.

**2. Master and servant ⊗⇒330(3) — Evidence
held to sustain judgment for assault by rail-
road watchman.**

Evidence *held* to sustain judgment against
railroad receiver for damages for assault com-
mitted by a ranger employed by defendant to
watch and protect properties.

Appeal from District Court, Upshur Coun-
ty; J. R. Warren, Judge.

Action by E. W. Crosby against J. L. Lan-
caster and others.  Judgment for plaintiff,
and defendants appeal.  Affirmed.

Appellee resided in Gilmer, but on the
night of December 28, 1922, was in Big
Sandy for the purpose of taking a train
over the Texas & Pacific Railway Company's
line of railway to Dallas, where his wife
was sick.  While waiting for the train in
Big Sandy, he was assaulted by one James
Bordeaux and one Henry Revels, who, the
testimony indicated, acted together in mak-
ing the assaults.  This suit for damages,
brought by appellee against appellants as
the receivers of said railway company, was
on the theory that they were liable for con-
duct of Bordeaux and Revels complained of.
Bordeaux, who held a commission as a Tex-
as Ranger at the time, was employed by ap-
pellants, they alleged, to "watch and pro-
tect the properties of the railroad."  With
reference to instructions given to him by
appellants and his authority to act for them,
Bordeaux testified:

"I had authority and directions from the rail-
road company to arrest anybody whom I saw
fit to arrest who was on the property of the
railroad in Big Sandy, in other words, who I
thought was violating the law or anything like
that, or whom I saw fit to arrest.  I had in-
structions to keep them off, arrest them, and I
also had authority to drag them out of the
depot if they refused to come out when I told
them to do so.  I had authority to protect the
depot, keep it free from bos, hobos, or any-
thing else, any trespassers; that was my in-
structions."

It appeared from the testimony of ap-
pellee as a witness, which was strongly cor-
roborated by the testimony of other witness-
es, that Bordeaux and Revels, after taking

a boy named Graham into custody for un-
lawfully, as they thought, riding to Big
Sandy on one of appellants' freight trains,
carried him to a room in the depot.  Part of
the testimony of appellee as to what after-
wards occurred was as follows:

"That room was right behind the ticket of-
fice.  I judge they stayed in there with the
boy about ten minutes.  I heard some part of
the conversation in there; that is, I could
catch a little of it once in a while.  I heard
the voices of both Revels and Bordeaux.  I
heard some curse words.  I heard them say
in there; that is, about the only sentence that
I got was 'Where you going, you son of a b——;
what are you doing around here?'  That is
about all I could catch; that is, the only sen-
tence that I could catch.  No, I did not hear
the boy say anything; that is, I could hear
him crying and I could hear him saying some-
thing, and I knew that he was talking, but I
did not know what he was saying.  They were
talking louder than he was.  The Graham boy
stuttered very badly.  After I heard them talk-
ing in there, they brought the boy out and
carried him off down the railroad track about
100 yards.  I walked on up that way, and when
I got close enough, where I could see, I saw
them throw a rock at him.  I do not know
whether the rock struck him or not, but he fell
down over the railroad.  I think it was Revels
who threw the rock.  Revels was at the side
of Bordeaux, and when he threw the rock they
turned and saw me coming, and they did not
follow the boy.  I asked him if there was a
fine against the boy, if there was I would
pay it, or if I could make bond I would make
his bond for him.  I don't know just how near
I was to them when I said that, but I was
as close as from here to you.  I told them
that I would buy him a ticket or pay his fine
or make his bond for him, either one.  They
told me that they didn't need me down there
attending to their business; it was Bordeaux
who said that; then he asked me did I know
I was interfering with the law and I told him,
'No, sir'; and by that time they had got up
close to me; Revels was in front and Bor-
deaux behind; Bordeaux told me to stick up
my hands and he touched me in the back—I
don't know whether he had his hand or what
he touched me with, but I stuck up my hands
and he run his hand down around me and
searched me and when I had my hands up
Revels hit me in front, and by that time Bor-
deaux was through searching me, and I turned
and run.  I run toward the station, toward
the waiting room; when I ran away one of
them hollered, 'Stop! stop!'  I couldn't tell
which one it was; that I heard Bordeaux say,
'I will get him; I will get him,' and that was
all I heard; if there was any rock or anything
thrown at me I did not know it.  I went into
the station waiting room.  When Revels struck
me up there, he struck me in the face, along
here on my cheek where I am now indicat-
ing; he hit me once there on my cheek.  No;
he did not say anything when he struck me.
When he struck me, my hands were up in
the air, and Bordeaux was behind me.  No; he
did not have hold of me, not at that time.
When I went into the waiting room of the de-

---

pot, I sat down I believe between Doctor Robertson and Mrs. Robertson. The next time I saw Bordeaux was when he came in the waiting room door. It was just a few minutes, not over two minutes, after I had gone in there and sat down. With reference to what he did and what he said when he came into the waiting room I will say that I don't remember now what he did say, but well, I believe he did say, 'Come and go with me,' or something like that; I am not sure whether that is the exact words he used or not. No; I did not make any reply to that. He then caught hold of me catching me first by my overcoat; he first caught my overcoat which was on me at the time; he caught my overcoat in the back and jerked that off of me; I do not know what he did with it when he jerked it off of me but he dropped it to the floor I think; I did not see what he did with the overcoat. He next then grabbed me by the coat collar right back there where I am now indicating. I was sitting in the seat when he was doing all of this to me. No; I did not say anything to him when he grabbed me. I did say something to him at some time while he was in the waiting room that I remember of; when he started out, I told him that I had not done anything and he did not say anything then. At that time he had me right by the back of the coat collar there, the shirt collar. He then carried me out the station door; when I got on the outside of the station door Henry Revels was at the station door, and he walked along by the side of us. Henry Revels did not have hold of me; that is my recollection. Yes; I was scared and excited; I was very nervous. too. Mr. Bordeaux had hold of the back of my neck, there where I am indicating I know. I don't know whether he had hold of me anywhere else or not. I don't remember whether he did or not. I was then carried back back of Mr. King's store, I believe it is, to the corner of a store. Yes; that is northeast from the depot. While I was being carried to this point, this man Revels was right at me, right at my right side all the time. Bordeaux did not turn me loose at all until we got around back of the buildings. I was hit once before I got around there by Henry Revels. I started to put my hand—drop my hands, and he said, 'Stick up your hands, you son of a b——;' and I threw up my hands, and then he hit me in the face. At that time Bordeaux had hold of the back of my neck. No. Bordeaux did not say anything then to Revels about striking me. I suppose they were about 75 feet at that time from the place where they finally carried me to. Yes; Revels said, 'Stick up your hands you son of a b——,' and struck me. Yes; I was then carried around back of the store. No; I was not struck any more between that point and the back of the store, not till we got to the corner of the building. When we got there, Revels hit me twice more, and Bordeaux said to him, 'That is enough; don't hit him any more.' Bordeaux had hold of me when Revels struck me those two times. Bordeaux had hold of me till he got through hitting me, and he finally told Revels not to hit me any more, that that was enough. Yes, there was some conversation occurred there. He asked me where I was from and I told him I was from Gilmer, and he asked me where I was going, and I told him; I told him I was going to Dallas. Yes; I told him why I was going to Dallas. I told him that my wife had phoned me to come over there; that the doctors wanted me to be there where she was, and then he told me, he said, 'You Gilmer people coming down here trying to run Big Sandy and I am going to show you sons of b—— that I am put down here to run it;' said 'The state is paying me $225 a month to run Big Sandy and I am going to run it to suit myself.' There was not any more conversation occurred then until we got back to the corner of the restaurant; that is, the corner of the building next to the restaurant. Dr. Robertson was standing there, and he told him if there was any fine or any bond to make that he would make it, that he would wake up somebody there and make the bond. In reply to that Bordeaux said to him that he did not need him interfering with his business, said he had carried me around there and give me a good talk. Yes; he used some curse words in connection with that. He said—I don't remember just now what he did say; I don't remember what he said. No; nobody had hold of me at that time. When Revels struck me up there that time, he hit me in the eye the first lick; the other time he hit me to the side of the neck, the nose or on the chin here, where I am now indicating. No; my nose did not bleed; the effect on which it had on my eye was that by the time I got back up to the depot my eye was practically closed. When Dr. Robertson spoke to him and said that he would pay my fine and make my bond and Bordeaux replied to Robertson that he did not want him interfering with him."

The case was submitted to the jury in a general charge, in which they were instructed to find for appellee, other conditions concurring, if they believed that Bordeaux acted within the scope of his duties as appellants' employé when he ejected appellee from the depot, or believed that Revels assaulted appellee while Bordeaux had him in his custody and that "Revels and Bordeaux were acting together in making such assault," or if Bordeaux "knew the purpose of Revels and aided him or encouraged him by words or acts in making such assault." The jury found in appellee's favor and assessed his damages at $4,000.

Briggs & Davis, of Gilmer, George Thompson, of Fort Worth, and R. S. Shapard, of Dallas, for appellants.

Simpson, Lasseter & Simpson, of Tyler, for appellee.

WILLSON, C. J. (after stating the facts as above). [1, 2] In the preparation of their brief appellants disregarded the requirement of rule 31 for the government of Courts of Civil Appeals, that a brief shall contain "a clear and accurate statement of the record bearing upon the respective propositions, with a reference to the pages of the record," and therefore are not entitled to have their contentions here considered. Engelman v. Anderson (Tex. Civ. App.) 243 S. W.

728; Equipment Co. v. Luse (Tex. Civ. App.) 250 S. W. 1104; Rubber .Co. v. Waldman (Tex.. Civ. App.) 257 S. W. 929; Holt v. Uvalde Co. (Tex. Civ. App.) 258 S. W. 285; Lange v. Lawrence (Tex. Civ. App.) 259 S. W. 261. However, we have read the record, including the testimony in the statement of facts, and considered same with reference to the grounds of the objection to the judgment, and have concluded that no reason, legal or otherwise, why it should be set aside, has been pointed .out. Therefore it will be affirmed. .